UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ELLAZAR WILLIAMS,

                                        Plaintiff,

          -against-                                        1:18-CV-01446 (LEK/DJS)

JAMES OLSEN, *et al.*,

                              Defendants.

_____

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Ellazar Williams commenced this action on December 16, 2018. Dkt. No. 1.

Plaintiff later filed an amended complaint on August 20, 2019, pursuant to 42 U.S.C. § 1983,

alleging violations of his Fourth Amendment rights against the City of Albany; John Does Nos. 1

through 25 unknown law enforcement officers of the City of Albany Police Department; and

Detectives James Olsen, Christopher Cornell, and Lawrence Heid (collectively, "Defendants").

Dkt. No. 47 ("Amended Complaint"). Plaintiff's claims arise out of a use of force incident that

rendered him permanently paralyzed from the chest down. Am. Compl. ¶ 22.

Now before the Court is a motion for summary judgment, Dkt. No. 90-1 ("Defendants'

Summary Judgment Memorandum"), along with a statement of material facts, Dkt. No. 90-2

("Defendants' Statement of Material Facts"), filed by Defendants. Plaintiff opposes the motion.

Dkt. No. 98 ("Plaintiff's Response to Defendants' Statement of Material Facts"); Dkt. No. 100

("Plaintiff's Memorandum"). Defendants have also submitted a reply memorandum, Dkt. No.

104, ("Defendants' Reply"). For the reasons that follow, Defendants' motion for summary

judgment is denied.

## II.    BACKGROUND

### A.  Factual History

The following facts are undisputed, except where otherwise noted.

### 1.  Events Preceding the Encounter Between Plaintiff and the Detectives

On August 20, 2018—before heading to the "260 block of Central Avenue"—
Plaintiff was smoking marijuana with his girlfriend's 18-year-old son at their home in Albany,
New York. Defs.' SMF ¶ 1. Meanwhile a few blocks away, Detectives Olsen, Heid, and Cornell
were working as a three-man team in an unmarked police vehicle assisting Albany's criminal
response unit ("CRU") with a firearm purchase near Clinton Avenue. Id. ¶ 2.

At approximately 4:30 PM that day, the police dispatch received a 911 call concerning a
fight outside a store located at 265 Central Avenue. Id. ¶ 3. The caller—an employee of the
store—informed dispatch that there was an individual with a gun threatening people. Id. The
caller told dispatch that the threatening individual was throwing glass and water bottles at the
store's front door and described the individual as a Black male with a gray hoodie and dark faded
jeans. Id. Dispatch then transmitted the call to other members of the police force. Id.

In her statement to police later that day, the employee who made the 911 call identified
the threatening individual as having braided hair and wearing a gray hoodie with dark jeans. Id. ¶
4. The employee stated that the individual in the gray hoodie told the store owner, "I will put a
burner in you[,]" before reaching to his side and pulling out a gun. Id. The store owner also
confirmed in a police statement that a Black man with a gray hoodie and braids threatened him
while showing a gun at his side. Id. The store owner identified Plaintiff in a "photo lineup" as the
"kid that got the gun." Id.

Shortly after the CRU purchase was finalized, Olsen, Cornell, and Heid were notified by Sgt. Plante that a call for a person with a gun was dispatched describing a Black male with a gray hoodie and gun in the 260 block of Central Avenue. Id. ¶ 6. Plante was insistent that the individual was not merely suspected of having a handgun, but that he possessed a handgun and threatened someone with the gun. Id. ¶ 7. In response, Olsen, Heid, and Cornell immediately drove toward Clinton Avenue, coming from Quail Street, conjecturing that the suspect would be coming up by North Lake Avenue. Id. ¶¶ 8–9. After making a right turn onto North Lake, Heid noticed a group with three individuals on the corner of the intersection, one of whom fit the description of the Black male in possession of a gun wearing a hoodie. Id. ¶ 10. This individual was Plaintiff. Id.

### 2.  *The Early Encounter Between Defendants and Plaintiff*

Plaintiff and Defendants sharply disagree about the encounter and ensuing chase. Defendants state that Heid pulled the unmarked police vehicle "diagonally" to the group and identified himself and the other two detectives by saying, "police, stop." Id. ¶ 12. Plaintiff, however, says that he never heard Heid identify himself or the other detectives as police officers. Pl.'s Resp. to Defs.' SMF ¶ 12. Additionally, Plaintiff says that Heid only "believed" that the officers identified themselves. Id.

Defendants state that after Heid identified the three detectives as police, Plaintiff began to run, and made a 180-degree turn heading east down Sherman Street. Defs.' SMF ¶ 13. Heid, Cornell, and Olsen pursued Plaintiff and left the other two individuals at the corner of North Lake because only Plaintiff fit the description of the Black male with a gun. Id. ¶ 14. Plaintiff disagrees with this characterization by pointing out that the officers never identified themselves, and contends that he did not make a U-turn, but instead ran away from the unmarked car and

unidentified police officers because he was scared. Pl.'s Resp. to Defs.' SMF ¶¶ 13–14. Plaintiff also states that the entire group of three ran from the unmarked vehicle, not just Plaintiff. Id. ¶ 14

### 3. The Ensuing Chase

As the detectives chased Plaintiff, Cornell began using his personal radio over the main police line to call out the officers' direction of travel and pursuit details. Defs.' SMF. ¶ 15. The vehicle chase led the detectives to follow Plaintiff through a parking lot to Elk Street, eventually cutting across the Tony Clement School parking lot. Id. ¶ 16.

Defendants contend that during the pursuit, Plaintiff kept his right hand concealed. Id. ¶ 17. Plaintiff, however, states that his hand was not in any way concealed throughout the entirety of the pursuit. Pl.'s Resp. to Defs.' SMF ¶ 17.

Heid slowed the vehicle as he turned into the parking lot that Plaintiff ran into, briefly coming to a stop. Defs.' SMF ¶ 18. At this point, Olsen exited the passenger side of the vehicle and ran around the front of the vehicle, following Plaintiff into the courtyard at the Tony Clement School. Id. Defendants state that Olsen was unable to see Plaintiff's hands because he concealed them, and given the nature of the call Olsen received, he considered Plaintiff a threat. Id. ¶ 19. Plaintiff, however, asserts that video evidence demonstrates that his hands were not concealed because his arms pumped as he ran. Pl.'s Resp. to Defs.' SMF ¶ 19. Further, Plaintiff contests the proposition that he should have been considered a threat. Id.

After briefly stopping for Olsen to exit the vehicle, Heid drove closer to the courtyard before putting the vehicle in park. Defs.' SMF. ¶ 20. At this point, Heid and Cornell witnessed Olsen run after Plaintiff, entering the courtyard from the northern part of the parking lot. Id. Only Olsen entered the courtyard initially, with Heid and Cornell behind on foot. Id. ¶ 21.

4

Defendants posit that Heid put the vehicle in park and drew his weapon, making his way down the sidewalk toward the courtyard, id. ¶ 22, but Plaintiff retorts that video evidence establishes that at the time of the shooting, Heid remained in the vehicle, Pl.'s Resp. to Defs.' SMF ¶ 22.

The parties disagree about whether Plaintiff could have exited the courtyard from a different location from where he entered; Defendants state that Plaintiff could not have left the area without running into Olsen based on the courtyard's high and unscalable fence on the opposite side of where Plaintiff entered, Defs.' SMF. ¶ 20, while Plaintiff says he could have scaled the fence, Pl.'s Resp. to Defs.' SMF ¶ 24. Additionally, Defendants state that Olsen never ran directly behind Plaintiff. Defs.'SMF. ¶¶ 24, 27. Instead, they claim Olsen staggered his running to ensure he did not get out ahead of Plaintiff. Id. ¶ 26. Plaintiff argues that the video evidence belies this assertion, showing that Olsen was directly behind Plaintiff several times. Pl.'s Resp. to Defs.' SMF ¶ 25.

According to Defendants, as Olsen entered the courtyard, he was staggered to the left of Plaintiff, Defs.' SMF. ¶ 28; Plaintiff was to the right of Olsen, running toward a fenced area at the top of the courtyard, id. Olsen claims to have seen "something" in Plaintiff's right hand. Plaintiff, however, disputes that Olsen was adjacent to him because there was only one opening in the courtyard each could have entered from. Pl.'s Resp. to Defs.' SMF ¶ 28. Moreover, Plaintiff disputes that he had anything in his hand, and given Olsen's position at this point in time, Plaintiff disputes that Olsen could have seen Plaintiff, much less his hand because Olsen was far behind Plaintiff. Id.

### 4. The Shooting

The parties sharply disagree over the circumstances that directly preceded the shooting of

Plaintiff.

a. Defendants' Version of the Shooting

Defendants assert that when Heid was in pursuit running to the courtyard, he heard "fear" in Olsen's voice after hearing Olsen exclaim, "[L]ook at his hand." Defs.' SMF. ¶ 29. Heid states that he then heard Olsen direct Plaintiff to "drop it" in reference to a knife. Id. Approximately four seconds later, Plaintiff tripped, hit the ground, and inadvertently dropped a large knife. Id. ¶ 30.[1] Olsen claims to have seen the knife, which had a long-serrated blade. Id. According to Defendants, while Plaintiff was on the ground for "approximately 1.735 seconds[,]" Olsen yelled, "get on the ground, get on the ground, let me see your hands, drop it, drop it, drop it." Id. ¶ 31. However, Plaintiff ignored Olsen's commands, rearmed himself, got up and ran toward Olsen. Id. ¶ 32. Plaintiff was rearmed with the knife he had dropped but could only exit the area via a path blocked by Olsen. Id. ¶ 34. Just after Plaintiff rearmed himself, Heid was running into the courtyard and was able to see a flash of chrome in Plaintiff's hand that he thought was a handgun. Id. ¶ 38.

Olsen fired two rounds at Plaintiff. Id. ¶ 39. Olsen estimated there was less than fifteen feet between him and Plaintiff when he shot Plaintiff. Id. Plaintiff's left side was facing Olsen at the time he fired his weapon and the bullet entered Plaintiff's left shoulder. Heid and Cornell arrived seconds after shots were fired and witnessed the knife laying on the ground. Id. ¶ 45. Plaintiff was later "escorted to Albany Medical Center." Id. ¶ 53.

b. Plaintiff's Version of the Shooting

---

[1] Defendants describe the knife as "Rambo style," Defs.' SMF ¶ 30, in reference to the action movie character "Rambo," played by Sylvester Stallone.

Plaintiff presents a vastly different portrayal of the moments before he was shot. Plaintiff first points out that Heid could not have heard Olsen command Plaintiff to "drop it," because camera footage placed Heid in the parking lot at the time, far away from this incident. Pl.'s Resp. to Defs.' SMF ¶ 29. Plaintiff also states that contrary to Defendants' recitation of the facts, Plaintiff was on the ground for shorter than 1.735 seconds when he fell. Id. ¶ 31. Even assuming *arguendo* that this time estimate is accurate, Plaintiff contends that it is plainly impossible for anyone to yell "get on the ground, get on the ground, get on the ground, let me see your hands, drop it, drop it, drop it" in the time span of 1.735 seconds as Olsen claims he did. Id. ¶ 31. Accordingly, Plaintiff states that he *never* had a knife in his hand, and thus could not have abided by Olsen's non-existent command. Id. ¶ 32. Critically, Plaintiff also notes that he never ran toward Olsen, and in fact, he was running *away* from Olsen the entire encounter. Id. ¶ 33. As a result, Olsen was not blocking any exit, and Plaintiff would have been able to exit through an area away from Olsen, which contradicts Defendants' collision course theory. Id. ¶ 38.

Plaintiff also asserts that he never "rearmed" after falling because he never had the knife or *any* weapon in his hand in the first place. Id. ¶ 33. Similarly, Plaintiff says that he was in front of Olsen the entire time, and thus could not "complete" the turns that Defendants asserts that Plaintiff did; therefore, he was never running in Olsen's direction. Id. ¶ 34. Plaintiff emphasizes that at no time did he "run toward Olsen, raise the knife, square up with Olsen, or even verbalize any intent to attack Olsen. Given the distance between Olsen and [Plaintiff] throughout the encounter, Plaintiff was never in a position to attack Olsen with a knife." Id. ¶ 35. Indeed, Olsen was nearly 25 feet away from Plaintiff when Olsen shot him. Id. ¶ 39.

Plaintiff also states that he was not shot on his left side, but in the back. Id. Additionally, Plaintiff notes that Heid and Cornell did not witness the events preceding the shooting since they

were still in the parking lot, which contradicts their contentions that they heard fear in Olsen's voice, and that they heard Olsen command Plaintiff to drop his weapon. Id. ¶ 38.

### 5. *The Aftermath*

After Olsen shot Plaintiff, Cornell checked Plaintiff's pulse, and called on the radio for an expedition of emergency services. Defs.' SMF ¶ 49. Plaintiff was escorted to Albany Medical Center, id. ¶ 53, and Olsen was taken to a hospital for evaluation. Id. ¶ 50. A few days later, Plaintiff was arrested on August 24, 2018, for Menacing a Police or Peace Officer and Criminal Possession of a Weapon with Intent to Use. Id. ¶ 56

## III.   LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving part." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing a court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In attempting to defeat a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party may not rely on mere conclusory allegations, speculation or conjecture, Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020), and must present more than a mere "scintilla of evidence" supporting its claims, Anderson, 477 U.S. at 252. At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S 133, 150 (2000), and "eschew[s] credibility assessments[,]" Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004) (quoting Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996)). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.    DISCUSSION

Defendants argue there are no genuine disputes of material fact regarding Plaintiff's Fourth Amendment excessive force claim because Defendants are entitled to qualified immunity. Defs.' S.J. Mem. at 2–13. Relatedly, Defendants maintain that Plaintiff's false arrest claim must fail because Defendants had probable cause to arrest Plaintiff, and even assuming that they did

not, they are entitled to qualified immunity. Id. at 14–16.[2] The Court addresses these arguments in turn.[3]

### A.  Qualified Immunity Defense to Plaintiff's Excessive Force Claim

In Anderson v. Creighton, the Supreme Court explained: "Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time." 483 U.S. 635, 639 (1987) (internal citations omitted). Consequently, qualified immunity shields "public officials from liability for civil damages when one of two conditions are satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Russo v. City of Bridgeport, 479 F.3d 196, 212 (2d Cir. 2007) (quotations omitted) (citing Poe v. Leonard, 282 F.3d 123, 133 (2d Cir. 2002)). The Supreme Court has indicated that "[f]or a constitutional right to be clearly established, its contours must be

---

[2] Defendants also address Plaintiff's failure to intervene claim against Cornell, Heid, and John Does Nos. 1 through 22 and Plaintiff's Monell claim against the City of Albany, but Plaintiff voluntarily withdrew these claims, Pl.'s Mem. at 7, so Defendants' responses to these claims are mooted. As a result, the City of Albany and John Does Nos. 1 through 22 (but not John Does Nos. 23 through 25 who are the subject of Plaintiff's supervisory liability claim not at issue here) are terminated from this action. Thus, this motion deals only with Plaintiff's excessive force and false arrest claims.

[3] The Court notes that Defendants do not appear to argue that any of Plaintiff's Fourth Amendment rights were not violated. See, e.g., Defs.' S.J. Mem. at 5 ("The question here is whether Detective Olsen violated *clearly established* law. . . .") (emphasis added). Instead, Defendants argue that they are entitled to qualified immunity because Defendants did not violate clearly established federal law, or alternatively, it was objectively reasonable for Defendants to believe their actions were lawful. See id. at 12. The Court points this out because in the qualified immunity analysis "The initial inquiry is whether a constitutional right would have been violated on the facts alleged, for if no right would have been violated, there is no need for further inquiry into immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001). As a result, the Court will proceed directly into the qualified immunity analysis since neither party contests any Fourth Amendment violations.

sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002). "This is *not* to say that an official action is protected by qualified immunity *unless the very action in question has previously been held unlawful*; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. (citing Mitchell v. Forsyth, 472 U.S. 511, 535 n.12 (1985)) (emphasis added); see also Walker v. Schult, 717 F.2d 119, 125–26 (2d Cir. 2013) ("Clearly established law does not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). Critically, the Second Circuit has elaborated that "the absence of a decision by this Court or the Supreme Court directly addressing the right at issue at issue will not preclude a finding that the law was clearly established so long as the preexisting law clearly foreshadows a particular ruling on the issue." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015).

Additionally, the Supreme Court has indicated that plaintiffs may defeat qualified immunity "even in novel factual similarities" under a different test established in Hope v. Pelzer. Hope, 536 U.S. at 741. Under Hope, the Supreme Court established that "[a] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question even though the very action in question has [not] previously been held unlawful." Id. at 741. The central concept is that of "fair warning," to a defendant that her "conduct violate[s] the Constitution." Id.

For excessive force claims in the Fourth Amendment context, law enforcement officers may use only such force as is objectively reasonable under the circumstances. See Saucier, 533 U.S. at 205. "The reasonableness of a particular use of force must be judged from the perspective

of a reasonable officer on the scene, rather than with 20/20 vision of hindsight."[4] Graham v. Connor, 490 U.S. 386, 396–97 (1989) (quotations omitted). The inquiry "depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." Salim v. Proulx, 93 F.3d 86, 92 (2d Cir. 1996). A court should ask if "officers of reasonable competence could disagree" on the legality of the officer's actions. Malley v. Briggs, 475 U.S. 335, 341 (1986). An officer may use deadly force to prevent an escape if "the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threated infliction of serious physical harm . . . and if, where feasible, some warning has been given." Tennessee v. Garner, 471 U.S. 1, 11–12 (1985).

Moreover, the inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. But "to allow the nature of the crime alone to justify the use of [deadly] force would thwart a central purpose of the Fourth Amendment limitations on use of force in making arrests, which is to preserve determination of guilt and punishment for the judicial system." Hemphill v. Schott, 141 F.3d 412, 417 (2d Cir. 1998) (citing Garner, 471 U.S. at 9).

---

[4] To avoid confusion about the term "reasonable," because it is used in both the qualified immunity and Fourth Amendment contexts, the Court notes that the reasonableness inquiries in the Fourth Amendment context and the second prong of the qualified immunity analysis under the Anderson v. Creighton framework are distinct and independent inquiries. In the qualified immunity context, the official's action "generally turns on the 'objective legal reasonableness' of the action." Creighton, 483 U.S. at 639. However, "pushes and shoves, like other police conduct, must be judged under the Fourth Amendment standard of reasonableness." Saucier, 533 U.S. at 209.

Finally, "[s]ummary judgment is inappropriate with regard to an excessive force claim when material facts are in dispute." Estate of Jaquez v. City of New York, 104 F. Supp. 3d 414, 438 (S.D.N.Y. 2015) (citing Kerman v. City of New York, 261 F.3d 229, 239–40 (2d Cir. 2001)). And summary judgment should not be granted based on qualified immunity under a theory of objective reasonableness "unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Husain v. Springer, 494 F.3d 108, 131 (2d Cir. 2007). With these standards in mind, the Court turns to Defendants' qualified immunity defense regarding Plaintiff's excessive force claim.

### 1.   *Whether Olsen's Shooting of Plaintiff Violated Clearly Established Law*

Defendants urge the Court to find that Olsen did not violate clearly established law when he employed deadly force against Plaintiff. Defs.' S.J. Mem. at 5. To support their argument, Defendants posit that under the test for excessive force for Fourth Amendment purposes, Olsen's use of deadly force was objectively reasonable. Id. In particular, Defendants state that it was reasonable for Olsen to employ deadly force because:

> (1) the Plaintiff matched the description of the 911 caller; (2) the 911 caller stated that the Plaintiff had a gun and had threatened someone with it; (3) the Detectives were advised in responding to the call that Plaintiff had a gun; (4) Plaintiff ran away as soon as the police arrived on scene; (5) the Plaintiff ignored loud repeated demands to stop and drop the weapon; and ([6]) while armed, the Plaintiff turned abruptly in the direction of the pursuing officer.

Id. at 11–12. Defendants also point to the fact that the incident unfolded in 31 seconds, and the alleged fact that Plaintiff rearmed himself "and turned back in the direction of Olsen." Id. at 12. In sum, Defendants state that: "Case law . . . has not unequivocally and consistently established whether or not an officer who uses deadly force during a dangerous foot chase of an armed,

fleeing suspect who presents an immediate threat to an officer violates the Constitution." Id. at
12.

The Court first observes that Defendants misstate how the Court must resolve ambiguities
and inferences on a summary judgment motion. Contrary to Defendants' recitation of the facts
and accompanying application of law, the Court must "draw all reasonable inferences" and
ambiguities in favor of the non-moving party, which is Plaintiff. Reeves, 530 U.S. at 150. While
Defendants portray circumstances wherein Plaintiff (1) fled from the detectives who
unambiguously identified themselves; (2) ignored police orders; and (3) abruptly turned to Olsen
with a knife, and presented an "immediate" threat to Olsen, Defs.' S.J. Mem. at 11–12, Plaintiff
provides evidence that depicts markedly different circumstances.

According to Plaintiff's testimony, the detectives approached Plaintiff on the street in an
unmarked black sedan, and contrary to Defendants' testimony, the detectives never identified
themselves as police; thus, Plaintiff ran away because he was scared that the car's passengers
could have been men who had earlier punched and shoved him, Dkt. No. 90-4 ("Plaintiff's
Deposition") at 85–86, 95, 121.

Moreover, Plaintiff testified—contrary to Olsen's testimony that Plaintiff was
brandishing a knife—that he "never had [the knife] in my hand." Pl.'s Dep. at 96. Additionally,
Olsen's own testimony appears to support Plaintiff's position as Olsen stated in a statement to
police, "*Before* he grabs the knife is when I discharge[d] my weapon," Dkt. No. 90-17 at 8
(emphasis added), which appears to undermine Olsen's prior testimony that Plaintiff "rearmed"
himself with the knife before Olsen shot him. Defs.' S.J. Mem. at 12. Plaintiff also provides
video evidence that a jury could credit showing that when Plaintiff was running from Olsen, the
knife was not in his hand, as Plaintiff's hands were visibly empty pumping back and forth while

he ran. Dkt. No. 99-2. Plaintiff similarly provides video evidence indicating that when Olsen shot

him, the knife was not in his hand either. Dkt. No. 99-9.

In the same vein, Plaintiff also testified that while he ran, Olsen did not advise him to get

on the ground, which contradicts Olsen's testimony that Plaintiff ignored his commands. Pl.'s

Dep. at 95–96.[5] Plaintiff further offers video evidence that—contrary to Olsen's testimony that

Plaintiff turned toward Olsen while holding a knife—Plaintiff fled in a straight line *away* from

Olsen, evidenced by the bullet wound sustained in his back. Dkt. No. 99-8 ("Dr. Cohen Report")

at 5 (observing that Plaintiff sustained a "gunshot wound to his *back* at the T3 level) (emphasis

added); Dkt. No. 99-9; see also Dkt. No. 99-2. Moreover, expert testimony from Dr. William M.

Harmening indicates that Olsen shot Plaintiff from twenty-four feet away while Plaintiff ran

toward a dead end in the courtyard. Dkt. No. 99-5 at 11.

Construing all inferences of favor of Plaintiff, Plaintiff provides evidence of the

following circumstances: Plaintiff fled from an unmarked black sedan with police officers who

never identified themselves. Pl.'s Dep. at 95–96. Plaintiff never had a knife in his hand or

threatened the officers as he fled from these unidentified individuals. Id. at 96. Finally, Plaintiff

ran away *without* a weapon in his hand toward a dead end but was nevertheless shot in the back

without warning or notice by Olsen, even though Plaintiff never brandished a weapon. Id. at 95–

96; Dkt. No. 99-9. From these facts, the Court now turns to whether Olsen violated clearly

established law under the Fourth Amendment by using excessive force. See Saucier, 533 U.S. at

202.

---

[5] Plaintiff claims that it is a dubious proposition that Olsen managed to yell at Plaintiff in a mere
1.735 seconds the following command: "get on the ground, get on the ground, let me see your
hands, drop it, drop it, drop it." Pl.'s Resp. to Defs.' SMF ¶ 31. However, this is a factual
determination best left to a jury.

The Court notes that the excessive force inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. However, "to allow the nature of the crime alone to justify the use of [deadly] force would thwart a central purpose of the Fourth Amendment limitations on use of force in making arrests, which is to preserve determination of guilt and punishment for the judicial system." Hemphill, 151 F.3d at 417.

Here, Plaintiff provides evidence which a reasonable jury could credit—specifically, that he was 24 feet away from Olsen without a weapon in hand when Olsen used deadly force without warning. Pl.'s Mem. at 15–16. Further, as Defendants repeatedly emphasize in their papers, immediately before Plaintiff was shot, "Plaintiff was trapped as soon as he entered the courtyard." Defs.' S.J. Mem. at 9. Thus, a reasonable jury could find the following circumstances: Plaintiff was trapped in a courtyard with no means of escape while 24 feet separated him from Olsen; and without warning, Olsen shot Plaintiff while Plaintiff's back was turned. Additionally, a jury could credit Plaintiff's testimony and video evidence that Plaintiff never brandished a weapon during the pursuit. Pl.'s Dep. at 97; Dkt. No. 99-9. From this evidence, the Court finds that a genuine dispute of material fact exists as to whether Plaintiff "posed an immediate threat to the safety of the officers or others." Graham, 490 U.S. at 396. A jury could find that Plaintiff was trapped in an empty courtyard with no means of escape and no way to "immediate[ly]" harm Olsen or bystanders. Id.

The Court must also factor in that, "the crime of which [Plaintiff] was suspected was extremely violent." Hemphill, 151 F.3d at 417. However, as noted above, "to allow the nature of

the crime alone to justify the use of [deadly] force would thwart a central purpose of the Fourth Amendment limitations on use of force in making arrests, which is to preserve determination of guilt and punishment for the judicial system." Id.

The Second Circuit's decision in Hemphill is instructive. In Hemphill, the plaintiff was suspected of committing the same crime as Plaintiff here (armed robbery) and fled to a nearby parking lot to hide money and drugs when he heard police sirens. Id. at 415. When arriving at the parking lot, he heard officers yell "put your hands up" and thereafter the plaintiff asked "me?" and attempted to raise his arms. Id. at 416. While the plaintiff was raising his harms, he was shot. Id. The plaintiff in Hemphill, like in this case presently before the Court, disputed whether the defendant provided warning before shooting. Id. at 417. Thus, because the plaintiff's version of the facts gave rise to a reasonable belief that he would not escape and because the officers did not offer a warning before shooting, the Second Circuit reversed a grant of summary judgment to defendants since there was a dispute of material fact about the reasonableness of force, even though the crime at issue was severe. Id. at 417–18.

Many of the same factual circumstances are present here when viewing the facts in a light most favorable to Plaintiff that a jury could credit. Similar to the plaintiff in Hemphill, here, (1) Plaintiff was suspected of armed robbery; (2) Plaintiff testified that he was not given a warning before he was shot, and thus necessarily did not defy warnings by Olsen; (3) Plaintiff was not in a position to immediately harm anyone when he was shot; and (4) although Plaintiff was suspected of having a gun, he never brandished a weapon throughout the pursuit similar to the plaintiff in Hemphill. Moreover, as Defendants note, "Plaintiff was trapped as soon as he entered the courtyard," Defs.' S.J. Mem. at 9, so his ability to escape and harm others was minimal.

17

Additionally, the facts as recited by Plaintiff also indicate that advance warning of the shooting was feasible. "Advance warning is only necessary where feasible, but the Officers do not appear to claim the circumstances made a warning not feasible in this case. Instead the officers assert that [a defendant police officer] did warn [plaintiff] clearly." Hemphill, 141 F.3d at 417 (citations omitted). As a result, Olsen offers the same defense as the officers in Hemphill, namely that that he actually *did* warn Plaintiff; but like the plaintiff in Hemphill, Plaintiff disputes Olsen's assertion. Pl.'s Dep. at 95–96. Thus, viewing the facts most favorably to Plaintiff, a reasonable jury could find that it was feasible for Olsen to warn Plaintiff before employing deadly force, and that he did not do so.

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396–97 (1989) (quotations omitted). The inquiry "depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." Salim v. Proulx, 93 F.3d 86, 92 (2d Cir. 1996). In that moment "immediately prior" to the use of force by Olsen, genuine disputes of material fact exist as to whether Plaintiff: (1) had a means of escape, (2) was brandishing a weapon or threatened Olsen, (3) was given a warning to stop running, and (4) was warned that he would be shot. These disputed facts foreclose a finding at the summary judgment stage that Olsen's use of force was objectively reasonable in the moment. Accordingly, "the preexisting law clearly foreshadows a particular ruling on the issue[.]" Garcia, 779 F.3d at 92. Specifically, Hemphill foreshadows that shooting a suspect without warning who poses no immediate threat, who does not brandish a weapon, and has no means of escape, even if he is suspected of committing armed robbery is proscribed by existing law. Additionally, Garner requires police officers to provide advance

warning of "inflicting serious body harm" when "feasible," <u>Garner</u>, 471 U.S. 1, 11–12, which Plaintiff provides evidence that Olsen failed to do, and should have done. Thus, "[s]ummary judgment is inappropriate with regard to an excessive force claim when material facts are in dispute." <u>Estate of Jaquez</u>, 104 F. Supp. 3d at 438 (citing <u>Kerman</u>, 261 F.3d at 239–40).

Defendants nevertheless cite to several cases to support their argument that Defendants did not violate clearly established federal law. Defs.' S.J. Mem. at 6–8. First, Defendants direct the Court to the Supreme Court's decision in <u>Kisela v. Hughes</u>, 138 S. Ct. 1148 (2018). In <u>Kisela</u>, the Supreme Court reversed a denial of summary judgment on the basis of qualified immunity to a police officer who responded to a radio report that a woman was acting erratically while holding a large knife. <u>See id.</u> at 1150, 1155. In <u>Kisela</u>, the defendant officers personally viewed the plaintiff holding a knife and advancing toward a woman approximately six feet away. <u>Id.</u> at 1150. Believing the woman was in imminent danger, the officers made repeated commands to the plaintiff to drop the weapon. <u>Id.</u> When the plaintiff refused, the defendant officer shot the plaintiff four times. <u>Id.</u>

However, <u>Kisela</u> is inapposite to the factual circumstances here when viewed in the light most favorably to Plaintiff. Unlike <u>Kisela</u>, a reasonable jury could credit Plaintiff's testimony and video evidence that he never had a weapon in his hand. Pl.'s Dep. at 96; Dkt. No. 99-9; Dkt. No. 99-2. Thus, while there was no dispute that the officers in <u>Kisela</u> personally saw the knife, there is a genuine dispute of material fact whether Olsen did so here. Additionally, in <u>Kisela</u> it was undisputed that the officers repeatedly commanded the plaintiff to drop the weapon. <u>Id.</u> at 1154. But here, according to Plaintiff, Olsen did not warn him before he shot him. Pl.'s Dep. at 95–96. Accordingly, <u>Kisela</u> provides little support that the actions of Olsen, as alleged by Plaintiff, require a finding of qualified immunity.

Defendants also cite to two unreported district court cases to support a finding of qualified immunity. First, they cite to Ridgeway v. City of Syracuse, 5:16-CV-0618, 2019 U.S. Dist. LEXIS 16003, at *31–33 (N.D.N.Y. Feb. 1, 2019). In Ridgeway, it was undisputed that the defendant officers observed the suspect holding a shotgun and instructed the plaintiff to stop. Id. at *32. However, the plaintiff ignored these commands and fled. Id. After the defendant caught up to the plaintiff, neither party disputed that the plaintiff appeared to be readying use of the shotgun and turned toward an officer. Id. Afterward the officer shot the plaintiff. Id. The district court did not reach the qualified immunity question but stated that the defendant would be entitled to qualified immunity if the court were to rule on qualified immunity. Id. at *35 n.10.

Here, however, the weapon at issue is a knife, not a gun. Moreover, it was undisputed that in Ridgeway, the plaintiff "abruptly turned toward" the defendant while brandishing a shotgun. Id. at *32. Conversely, in the present case, Plaintiff provides evidence that he never brandished the knife in question. See Pl.'s Dep. at 96; Dkt. No. 99-2; Dkt. No. 99-9. Moreover, unlike Ridgeway, when viewed in the light most favorably to Plaintiff, evidence suggests that Olsen did not issue a warning before he shot Plaintiff. Pl.'s Dep. at 95–96. Additionally, a reasonable jury could find that Plaintiff's testimony and video evidence indicate that Plaintiff was running away from Olsen, not toward him. Id. at 96; Dkt. No. 99-2. Accordingly, Defendants' reliance on Ridgeway is wholly inapposite since there is a genuine dispute of material fact whether Plaintiff charged Olsen with a knife (a *different* weapon than in Ridgeway) and a dispute of material fact as to whether Olsen warned Plaintiff before he shot him.

Finally, Defendants rely on another unreported case. See Scott v. City of Rochester, 17-CV-6311, 2019 U.S. Dist. LEXIS 144452, at *9 (W.D.N.Y. Aug. 23, 2019). In that case, an officer was granted qualified immunity after responding to reports of domestic abuse. Id. There,

it was undisputed that the plaintiff was repeatedly told to "freeze," and "stop," but the plaintiff refused to comply with the officers' commands. Id. It was also undisputed that the police saw a firearm on the plaintiff's person. Id. As a result, an officer shot the plaintiff. Id. However, in the case currently before the Court, a reasonable jury could credit Plaintiff's testimony and video evidence that the officers never saw any weapons on Plaintiff that would justify shooting Plaintiff, and further, a jury could find that the officers never commanded Plaintiff to stop. Pl.'s Dep. at 95–96; Dkt. No. 99-2; Dkt. No. 99-9. Therefore, reliance on Scott is inapt because the factual circumstances are substantially different when viewing the facts in the light most favorably to Plaintiff and the accompanying precedent from Hemphill. Accordingly, "[t]he unreported District Court opinions cited by the officers are distinguishable on their own terms. But regardless, they would be no match for the Circuit Precedents . . . ." Hope, 536 U.S. at 747 (footnote omitted).

In sum, the Court finds that there is a triable issue as to whether Olsen violated clearly established law when he shot Plaintiff. The Court now turns to whether it was objectively reasonable for Olsen to believe that his actions toward Plaintiff were permissible under the Fourth Amendment.

   2.   *Whether it was Objectively Reasonable for Olsen to Believe His Actions Comported with the Fourth Amendment*

Defendants next argue, "Even assuming the law was clearly established, it was objectively reasonable for detective Olsen to believe that he did not violate Plaintiff's rights." Defs.' S.J. Mem. at 12.

In the Second Circuit, "[e]ven where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a

government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." <u>Lennon v. Miller</u>, 66 F.3d 416, 420 (2d Cir. 1995).

As discussed above, under the Fourth Amendment, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." <u>Graham</u>, 490 U.S. 396– 97. The inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Graham</u>, 490 U.S. at 396. But "to allow the nature of the crime alone to justify the use of [deadly] force would thwart a central purpose of the Fourth Amendment limitations on use of force in making arrests, which is to preserve determination of guilt and punishment for the judicial system." <u>Hemphill v. Schott</u>, 151 F.3d 412, 417 (2d Cir. 1998) (citing <u>Garner</u>, 471 U.S. at 9). Defendants contend:

> Here, Defendants argue that for Detective Olsen to be denied the protection and shield of qualified immunity, the Court would have to find that not a single reasonable officer, confronted with the same situation— a fleeing suspect, who is armed with a large Rambo style knife and potentially a gun, who is ignoring repeated demands to drop a weapon and who has rearmed himself and turned back in the direction of the officer and is perceived to be within a 15 foot radius—would have shot the Plaintiff out of fear for his or her own life.

Def. S.J. Mem. at 13.

This argument, however, misses the mark. As discussed above, Defendants misstate the standard the Court must use when ruling on a summary judgment motion. The Court must "draw all reasonable inferences" and ambiguities in favor of Plaintiff. <u>Reeves</u>, 530 U.S. at 150. Moreover, Plaintiff deeply contests Defendants' above characterization. For instance, the Court finds that a reasonable jury could credit Plaintiff's testimony and proffered video evidence to

find that Plaintiff did not brandish or hold a knife. Pl.'s Dep. at 96. Or, assuming *arguendo* that

Plaintiff held a knife, as claimed by Defendants, a reasonable jury could also find that the

officers never demanded that Plaintiff drop said weapon, Pl.'s Dep. at 95–96; Dkt. No. 99-2;

Dkt. No. 99-9. Additionally, the Court also finds that a jury could credit this same evidence and

find that Plaintiff never turned toward Olsen, but rather was running away from Olsen into an

empty dead-end courtyard. Dkt. Nos. 99-2; 99-9; see also Dr. Cohen Report at 5.

 Moreover, because Plaintiff provides evidence that suggests none of the detectives saw a

knife on Plaintiff, Defendants' argument erroneously urges the Court to judge the Defendants'

actions based on the discovery of Plaintiff's knife that was gained *after* the encounter. Pl.'s Dep.

at 95–96. Defendants thus ask the Court to impermissibly view the situation with a "20/20 vision

of hindsight," Graham, 490 U.S. 396. However, the Supreme Court in Graham forbade lower

courts from employing this type of ad hoc analysis. See id. Similarly, the distance between

Plaintiff and Olsen is hotly contested, and Plaintiff provides expert testimony that demonstrated

that 24 feet separated the two, Dkt. No. 99-5 at 11; Pl.'s Mem. at 14–15, in an empty courtyard

where Plaintiff could not escape and posed no immediate threat to the officers or bystanders.

 Importantly, the Second Circuit has instructed that in qualified immunity cases where

factual disputes exist regarding whether it was objectively reasonable for defendants to believe

they were acting lawfully, it is the jury's role to resolve the disputes, not the Court. See Oliveira

v. Mayer, 23 F.3d 642, 650 (2d Cir. 1994) ("These [factual] disputes bear directly upon whether

it was objectively reasonable for the officers to believe they were acting lawfully . . . The District

Court should have let the jury (a) resolve these factual disputes and (b) based on its findings,

decide whether it was objectively reasonable for the defendants to believe that they were acting

within the bounds of the law . . . .) (internal citations omitted); Calamia v. City of New York,

879 F.2d 1025, 1036 (2d Cir. 1989) ("The right of an individual not to be subjected to excessive force has long been clearly established. Thus, the question here was whether it was objectively reasonable for [the defendant] to believe that his treatment of [the plaintiff] did not violate that right. This was a matter as to which the *facts were not undisputed*, and hence it was a *question to be answered by a properly instructed jury*.") (emphasis added).

Here, several factual disputes exist concerning: (1) whether Plaintiff was armed; (2) whether Plaintiff re-armed himself; (3) whether Plaintiff ignored Olsen's commands; (4) whether Plaintiff ran in the direction of Olsen; (5) whether Plaintiff could have escaped; (6) whether Olsen warned Plaintiff he would be shot; and (7) the distance between the two when Olsen shot Plaintiff. Pl.'s Mem. at 14–15. "These disputes bear directly upon whether it was objectively reasonable for the officers to believe they were acting lawfully." Oliveira, 23 F.3d at 650.

Therefore, when resolving all inferences in favor of Plaintiff, the Court finds that a reasonable jury could find that it was not objectively reasonable for Olsen to believe that he did not violate Plaintiff's Fourth Amendment right to be free from unreasonable seizures of the person. According to Plaintiff, Olsen shot Plaintiff when Plaintiff "could not have been a threat to the officers. If [the plaintiff] was not a threat, [defendant's] use of lethal force was improper." Estate of Jaquez, 104 F. Supp.3d at 438; see also Hemphill, 141 F.3d at 417–18 ("Without disparaging police officers' need to make split-second decisions in extremely dangerous situations, [plaintiff's] statement of facts, construed most favorably to him, describes a constitutionally unreasonably seizure—riddling, if you will—of his person."). Accordingly, the Court denies Defendants' motion for summary judgment predicated on the defense of qualified immunity with respect to Plaintiff's excessive force claim against Olsen.

### 3. *A Reasonable Jury Could Also Find that Olsen Had a "Fair and Clear Warning" that His Conduct Violated the Fourth Amendment*

As discussed above in Section IV.A, plaintiffs may also defeat qualified immunity by the test established by the Supreme Court in Hope v. Pelzer. In Hope, the Supreme Court employed the "fair and clear warning" standard from United States v. Lanier, 520 U.S. 259, 271 (1997), such that general statements of law and other sources independent of circuit holdings were sufficient to preclude summary judgment. Hope, 536 U.S. at 745–46. Id. The Supreme Court noted that general statements of the law "are not inherently incapable of giving fair and clear warning, and in other instances, a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." Id. at 741. With respect to the conduct at issue in Hope, prison guards handcuffed a prisoner to a hitching post for seven hours in the sun with little water and refused to allow him to use a restroom. Id. at 735. The Supreme Court observed, "The obvious cruelty inherent in this practice should have provided respondents with some notice that their alleged conduct violated [plaintiff's] constitutional protection[s] . . ." Id. at 745. In reaching this conclusion, the Supreme Court relied on Department of Justice reports condemning the tying of prisoners to hitches, id., the "reasoning" of courts of appeals cases rather than holdings addressing the specific conduct at issue, id. at 743, and Department of Correction regulations. Id.

More recently, in Taylor v. Riojas, 141 S. Ct. 52 (2020) (per curiam), the Supreme Court relied on Hope's "fair and clear warning" framework to deny qualified immunity to prison officials. In that case, two prison cells contained massive amounts of feces, and although there was no binding case on point involving these facts, the Supreme Court denied qualified

immunity, finding that the prison officials had fair warning that their acts were unconstitutional. Id. at 54–55.

The U.S. Court of Appeals for the Fifth Circuit recently relied on the reasoning of Hope in the context of the First Amendment. See Villarreal v. City of Laredo, Texas, 44 F. 4th 363 (5th Cir. 2022). There, the Fifth Circuit reversed a finding of qualified immunity against the City of Laredo, Texas for arresting a journalist who reported on information that violated a Texas criminal statute. Id. at 368. In reversing the finding of qualified immunity, the Fifth Circuit could not identify materially similar cases, but denied qualified immunity anyway, observing that, "The point is this: The doctrine of qualified immunity does not always require the plaintiff to cite binding case law involving identical facts. An official who commits a patently obvious violation of the Constitution is not entitled to qualified immunity." Id. at 371. (citing Hope, 536 U.S. at 745).

Here, the Court concludes that a reasonable jury could credit Plaintiff's testimony and video evidence demonstrating that Olsen had a "fair and clear warning" that apprehending Plaintiff by using deadly force was unreasonable under the Fourth Amendment. Hope, 536 U.S. at 741; see also Garner, 471 U.S. at 7 ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). In particular, because disputed issues of material fact exist, the Court finds that a jury could credit Plaintiff's evidence that: Plaintiff fled from an unmarked black sedan with police officers who never identified themselves, Pl.'s Dep. at 95; Plaintiff never had a knife in his hand or threatened the officers as he fled from these unidentified individuals; id. at 95–96, and that Plaintiff ran away *without* a weapon in his hand toward a dead end but was nevertheless shot in the back twice without warning or notice by Olsen, while 24 feet separated the two. Id.;

Dkt. No. 99-2; Dkt. No 99-9. Thus, a genuine dispute of material fact exists as to whether Plaintiff was a threat to the officers.

Consequently, when viewing these facts in the light most favorable to Plaintiff at this stage in the litigation, the Court finds that Olsen had a "fair and clear" warning that shooting someone who was not a threat to Olsen or anyone nearby was a constitutionally unreasonable use of force under the Fourth Amendment. Garner, 471 U.S. at 11 ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). Additionally, courts in this Circuit have held that when a plaintiff "could not have been a threat to the officers . . . [defendant's] use of lethal force was improper." Estate of Jaquez, 104 F. Supp.3d at 438; see also Hemphill, 141 F.3d at 417–18. Therefore, a reasonable jury could find that by using deadly force against someone who posed no immediate threat to officers or bystanders, Olsen had "some notice that [his] alleged conduct violated [Plaintiff's] constitutional protections." Hope, 536 U.S. at 745. Accordingly, qualified immunity is denied to Olsen on this basis as well.

### B.  Plaintiff's Probable Cause Claim

Defendants next argue that they should be granted summary judgment on Plaintiff's false arrest claim because Defendants had probable cause to arrest Plaintiff. Defs.' S.J. Mem. at 14. They also argue that they should be granted qualified immunity even if they lacked probable cause. Id. at 15.

In New York, the tort of false arrest is synonymous with false imprisonment. See Jacques v. Sears, Roebuck & Co., 285 N.E.2d 871, 875 (N.Y. 1972); Posr v. Doherty, 944 F.2d 91, 96

(2d Cir. 1991). For ease of reference, the Court will use the term false arrest. "In analyzing claims alleging the constitutional tort of false arrest, we have generally looked to the law of the state in which the arrest occurred." Russo, 479 F.2d at 203 (quotations omitted) (citing Davis v. Rodriguez, 364 F.3d 424, 433 (2d Cir. 2004)). A federal claim for false arrest premised on the Fourth Amendment right to be free from unreasonable seizures, including arrest without probable cause, is "substantially the same" as a false arrest claim under New York law, except for Section 1983's requirement that the constitutional tort be under color of state law. See Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). To state a claim for false arrest in New York, a plaintiff must show that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Id. at 853.

Moreover, "Probable cause is defined as such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty.'" Barone v. United States, 722 Fed. App'x 57, 60 (2d Cir. 2018) (quoting Perryman v. Vill. of Saranac Lake, 839 N.Y.S.2d 290, 292 (N.Y. App. Div. 2007))).

Similarly, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." Martinez, 202 F.2d 625, 634 (2d Cir. 2000). "Probable cause is arguable if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Figueroa v. Mazza, 825 F.3d 89, 100 (2d Cir. 2016) (cleaned up).

*1. The New York State Criminal Statutes at Issue*

Four days after Olsen shot Plaintiff, Plaintiff was arrested for: (1) Menacing a Police

Officer in violation of Section 120.18 of the New York Penal Law; and (2) Criminal Possession

of a Weapon in the Fourth Degree with the Intent to use in violation of Section 265.01(2) of the

New York Penal Law. See Defs.' SMF ¶ 56.

Under Penal Law §120.18:

> A person is guilty of menacing a police officer or peace officer when he or she intentionally places or attempts to place a police officer or peace officer in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, knife, pistol, revolver, rifle, shotgun, machine gun or other firearm, whether operable or not, where such officer was in the course performing his or her official duties and the defendant knew or reasonably should have known that such victim was a police officer or peace officer.

Under Penal Law § 265.01(2):

> A person is guilty of criminal possession of a weapon in the fourth degree when: . . . (2) He or she possesses any dagger, dangerous knife, dirk, machete, razor, stiletto, imitation pistol, undetectable knife or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another . . . .

Defendants contend that probable cause existed to arrest Plaintiff for violating these

statutes because:

> At the time of the arrest [four days after Plaintiff was shot], the Detectives possessed the following information: (1) a 911 call was placed regarding a man wearing a dark gray hoodie and jeans who had a gun and had threatened someone with it; (2) the Plaintiff matched the description of the 911 call; (3) Detectives Olsen, Heid and Cornell were advised in responding to the call that the suspect had a gun; (4) the Plaintiff took off running as soon as there was police presence on scene, and while he was running, kept one of his hands concealed; (5) the Plaintiff ignored and disobeyed the Detective's commands for him to stop; (6) while fleeing, the Plaintiff fell and dropped a large knife, and then rearmed himself with it, despite the Detectives['] commands for him to stop, get on the ground, and drop the weapon; and (7) after rearming himself and disobeying the Detectives' commands, the Plaintiff turned back in the direction of Detective Olsen, which placed Detective Olsen in imminent fear of his life.

Defs.' S.J. Mem. at 15.

As discussed above, at this stage of the litigation, the Court must draw all inferences in Plaintiff's favor. Plaintiff sharply contests reasons 4, 5, 6, and 7 that Defendants proffer as justifications for probable cause. See Pl.'s Resp. to Defs.' SMF ¶¶ 32–35. As Plaintiff puts it, "it is disputed that [Plaintiff] (1) placed Detective Olsen in fear of serious physical injury or death, (2) displayed a knife, (3) ignored Detective Olsen's commands, (4) ran in the direction of Detective Olsen or (5) held the knife in his hands." Pl.'s Mem. at 17. Drawing all inferences in the light most favorable to Plaintiff, the Court finds: Plaintiff fled from an unmarked black sedan with police officers who never identified themselves, Pl.'s Dep. at 95; Plaintiff never had a knife in his hand or threatened the officers as he fled from these unidentified individuals; id. at 95-96, and Plaintiff ran away *without* a weapon in his hand, and never brandished a weapon. See id.

With respect to violating Penal Law § 120.18, the Court agrees with Plaintiff that genuine disputes of material fact exist regarding whether Defendants had probable cause to arrest Plaintiff. New York State courts have held that the intent element of Penal Law § 120.18 "may be inferred from a defendant's conduct and from the surrounding circumstances." People v. Roach, 989 N.Y.S. 2d 530, 531 (N.Y. App. Div. 2014); People v. McCottery, 935 N.Y.S. 2d 687, 690 (N.Y. App. Div. 2011).

Here, Plaintiff provides evidence that—contrary to Defendants' characterization—his hands were visibly empty pumping back and forth while he ran. Dkt. No. 99-2. Plaintiff similarly provides video evidence indicating that when Olsen shot him, the knife was not in his hand. Dkt. No. 99-9. Moreover, Plaintiff provides expert testimony that 24 feet separated Plaintiff and Olsen when he was shot. Dkt. No. 99-5 at 11. The Court thus concludes that based on Plaintiff's version of the facts, a reasonable jury could find that probable cause was not present because a

"reasonably prudent person in like circumstances" could find that Plaintiff was not "guilty" of violating Penal Law §120.18. Barone, 722 Fed. App'x at 60.

Indeed, "inferring . . . [D]efendants['] conduct and . . .  the surrounding circumstances," a genuine dispute of material fact exists concerning whether Defendants had probable cause to arrest Plaintiff under Penal Law § 120.18, if, as Plaintiff alleges, Plaintiff failed to *ever* put the detectives in a "reasonable fear of physical injury, serious physical injury or death." Roach, 989 N.Y.S. 3d. at 531; McCottery, 935 N.Y.S. at 690.

For similar reasons, the Court finds that Defendants are not entitled to qualified immunity for Plaintiff's false arrest claim with respect to Penal Law §120.18. A "defending officer need only show 'arguable' probable cause" for a finding of qualified immunity in the false arrest context. Martinez, 202 F.2d at 634. "Probable cause is arguable if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Figueroa, 825 F.3d at 100.

However, based on the evidence presented by Plaintiff that he ran away and never threatened the detectives, Pl.'s Dep. at 95–96, never brandished a weapon, id. at 96 and remained more than 20 feet apart from the detectives, the Court finds that probable cause was not even arguably present for arresting Plaintiff under Penal Law §120.18. Penal Law § 120.18 requires that an individual "intentionally" place officers in a "reasonable fear of physical injury, serious physical injury or death." But as discussed above at length, Plaintiff offers evidence that he never threatened the officers or brandished a weapon during the chase that would warrant a reasonable fear of injury. It is also a disputed fact whether Plaintiff "knew or should have known" that the detectives were police officers under Penal Law § 120.18 because the detectives were in an

31

unmarked car, and according to Plaintiff, they never identified themselves. Pl.'s Resp. to Defs.'
SMF ¶ 12. Indeed, a reasonable jury could find that Plaintiff could not have known they were
police officers given that he testified that he ran away because he was "scared" that the
individuals in the unmarked car were the people who had beat him up earlier, and that the
officers did not identify themselves. See Pl.'s Dep. at 85–86, 95, 121 Accordingly, "there was
nothing for defendants to interpret in a way that gave them even arguable probable cause"
regarding Penal Law §120.18. Zellner v. Summerlin, 494 F.3d 344, 374 (2d Cir. 2007). Thus,
"officers of reasonable competence could not disagree" that probable cause was absent when
drawing all inferences in favor of Plaintiff. Figueroa, 825 F.3d at 100.

Defendants similarly argue that they had probable cause to arrest Plaintiff under Penal
Law § 265.01(2). However, when drawing all inferences in favor of Plaintiff, Defendants did not
know the knife at issue existed until Olsen shot Plaintiff. Dkt. No. 99-2; Dkt. No. 99-9; Pl.'s
Dep. at 95–96. Thus, a "reasonably prudent person in like circumstances" would not think
Plaintiff possessed a knife if there were no facts indicating the possession of said knife. Barone,
722 Fed. App'x at 60. This would mean that a reasonable jury could find that Defendants lacked
probable cause to arrest Plaintiff for criminal possession of a weapon in the fourth degree prior to
the shooting because Defendants did not know about the knife.

The next question the Court must address is whether probable cause emerged *after*
Defendants found the knife on Plaintiff once he was shot.

First, the Court agrees with Defendants that a reasonable jury could find that the knife
found on Plaintiff may be considered a "dangerous knife" under Penal Law § 265.01(2), because
"the circumstances of its possession including the behavior of its possessor demonstrate that the
possessor himself considered it a weapon . . . ." In re Edwin O., 937 N.Y.S.2d 94, 95 (N.Y. App.

Div. 2012). Specifically, Plaintiff concedes that the knife was needed for self-defense. He contemplated its use to defend himself from a group of men who beat him up previously, because "[he] was by [himself] and there was five of them," Pl.'s Dep. at 42, which indicates that Plaintiff considered the knife a weapon.

However, Defendants' argument falters in satisfying Penal Law § 265.01(2)'s requirement that the possessor have "intent to use the same unlawfully against another" for the purposes of probable cause. A jury could credit Plaintiff's testimony and video evidence that he never brandished a weapon during the pursuit. Pl.'s Dep. at 97; Dkt. No. 99-9.

The facts of People v. Flores, 167 N.Y.S. 3d 706 (N.Y. App. Div. 2022) are illustrative. There, the New York State Appellate Division for the Second Judicial Department reversed the defendant's conviction because the court found that the prosecution failed to satisfy the intent element of Penal Law § 265.01(2). In particular, because the weapon was merely "holstered on the [defendant's] side," the court found that this was "hardly an allegation of planned unlawful use . . . [thus,] we find that the conclusory allegation of unlawful intent renders the charge insufficiently charged." Id. at 1 (citations omitted).

Here, the Court concludes that a reasonable jury could find that there was no reasonable basis for the officers to believe that Plaintiff intended to use the knife because Plaintiff never brandished it after he was shot. Pl.'s Dep. at 97; Dkt. No. 99-9. Finding that Plaintiff intended to use the knife against the detectives after he was shot proves difficult because Plaintiff was on the ground awaiting medical attention from a bullet wound that ultimately rendered him paralyzed. Defs.' SMF ¶ 49. Even Defendants concede that "Plaintiff was not a threat" after Olsen shot him. Id. ¶ 50. Accordingly, a reasonable jury could conclude that no "reasonably prudent person in like circumstances" would think that Plaintiff intended to use the knife after Plaintiff was shot,

such that probable cause was lacking to arrest Plaintiff under Penal Law § 265.01(2). <u>Barone</u>, 722 Fed. App'x at 60.

For the same reasons, when viewing the facts in the light most favorably to Plaintiff, a reasonable jury could find that Plaintiff never brandished a weapon against the officers, let alone showed an *intent* to use a weapon, such that arguable probable cause that Plaintiff violated Penal Law § 265.01(2) was not met. Consequently, when drawing all inferences of favor of Plaintiff, "officers of reasonable competence could not disagree" that probable cause was lacking. <u>Figueroa</u>, 825 F.3d at 100. As a result, "there was nothing for defendants to interpret in a way that gave them even arguable probable cause" regarding Penal Law § 265.01(2). <u>Zellner</u>, 494 F.3d at 374. Accordingly, Defendants' motion for summary judgment regarding Plaintiff's false arrest claim is denied.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' motion for summary judgment (Dkt. No. 90) to the extent it sought dismissal of Plaintiff's Fourth Amendment excessive force and false arrest claims be **DENIED**; and it is further

**ORDERED**, that the City of Albany and John Does Nos. 1 through 22 be **TERMINATED** as defendants in this action; and it is further

**ORDERED**, that the Clerk is respectfully directed to amend the caption to reflect the termination of the City of Albany and John Does No. 1 through 22 as defendants in this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:        November 1, 2022
              Albany, New York

LAWRENCE E. KAHN
United States District Judge